IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **HARKINS BUILDERS, INC.**<br>10490 Little Patuxent Parkway, Suite 400<br>Columbia, MD 21044<br><br>     *Plaintiff*,<br><br>    v.<br><br>**GREAT MIDWEST INSURANCE CO.**<br>800 Gessner Road, Suite 600<br>Houston, TX 77024<br><br>     *Defendant*. | **Civil Action No.** _____ |

## COMPLAINT

Plaintiff, Harkins Builders, Inc. ("Harkins"), by and through the undersigned counsel, states and avers as follows in support of its Complaint against Defendant, Great Midwest Insurance Co. ("GMIC").

**I.**     **The Parties.**

1. Harkins is an employee-owned Maryland corporation with its principal place of business located at 10490 Little Patuxent Parkway, Suite 400, Columbia, Maryland 21044.

2. At all times relevant hereto, Harkins has been registered to conduct business as a general contractor in the State of Maryland.

3. Upon information and belief, GMIC is a Michigan corporation with its principal place of business located at 800 Gessner Road, Suite 600, Houston, Texas 77024.

4. It is believed that GMIC is duly licensed to issue surety bonds in the State of Maryland.

5. It is further believed that GMIC regularly transacts surety and insurance business in the State of Maryland.

## II.  Jurisdiction and Venue.

6. This Court may exercise personal jurisdiction over Harkins, which is a resident of the State of Maryland, and GMIC, which regularly transacts surety and insurance business in the State of Maryland, including, as discussed more fully below, issuing the three performance bonds at issue in this matter.

7. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), as the Parties are citizens are different states, and the amount in controversy exceeds $75,000.00.

8. Venue properly lies in the U.S. District Court for the District of Maryland because a substantial part of the events or omissions giving rise to this matter occurred in Maryland, and both construction projects at issue are located in Maryland.

## III.  Background.

9. GMIC issued payment and performance bonds (each a "Bond, and collectively, the "Bonds") that are at issue in this matter.

10. In all three instances, GMIC issued the Bonds to its principal, Wood & Stone, Inc. ("WSI"), naming Harkins as obligee.

11. Upon information and belief, WSI is, and at all times relevant hereto has been, a supplier and installer of countertops and cabinets in the Delaware-Maryland-Virgina region.

12. Pursuant to three separate subcontracts (each, a "WSI Subcontract," and collectively, the "WSI Subcontracts" when referred to together), Harkins engaged WSI to, among other things, furnish and install countertops and cabinetry for two separate construction projects: (a) the James Run Apartments project ("James Run"), located at 543 Creswell Road, Churchville, MD 21028, and (b) the Rosewick Apartments project ("Rosewick"), located at the intersection of Rosewick Road and Washington Avenue in La Plata, MD 20646.

13. James Run involved the new construction of 304 apartment units, a pool house, maintenance building, and an Amazon Center, and Rosewick involved the new construction of 193 apartment units.

### A. The James Run Project.

#### 1. *The James Run Countertop Subcontract.*

14. Pursuant to a written subcontract agreement dated May 31, 2023, Harkins engaged WSI to furnish and install all solid surface countertops in all residential unit kitchens and bathrooms, as well as interior and exterior amenity spaces, at James Run (the "James Run Countertop Subcontract"). A copy of the James Run Countertop Subcontract is attached to this Complaint as Exhibit "A."

15. The James Run Countertop Subcontract's original value was $934,455.22, which Harkins agreed to pay in exchange for WSI's timely performance of its work in strict accordance with the James Run Countertop Subcontract. Ex. A, James Run Countertop Subcontract § 1, at 1.

16. The James Run Countertop Subcontract stated that "time [was] of the essence," and WSI agreed to perform its work in a "first-class manner in accordance with the Contractor's construction schedule for the Work, which may be modified from time to time by Contractor as reasonably necessary." *Id.* § 5, at 2.

17. Furthermore, WSI was required to "supply a sufficient number of skilled workmen or quantity or type of materials or equipment of proper quality" and to "prosecute the Work of covered by [the] Subcontract with promptness and diligence." *Id.*

18. However, WSI failed and/or refused to provide an adequate amount of countertop material and manpower to prosecute its work diligently in accordance with the James Run schedule and WSI's agreed upon production rates.

19.     Furthermore, Harkins was notified by WSI's countertop vendor, Granite Discounter, that WSI had refused and/or failed to pay it sums due for material fabrication and delivery.

20.     WSI subsequently admitted to Harkins that it was unable to pay Granite Discounter or honor its other financial commitments relating to the James Run Countertop Subcontract.

21.     WSI's admission included the unequivocal statement to Harkins that WSI lacked sufficient funds to procure the proper quantity of countertop material needed to complete performance of WSI's work under the James Run Countertop Subcontract.

22.     Following multiple discussions and communications with WSI about its failure to perform, Harkins issued a Declaration of Default/Breach and Direction to Cure to WSI and GMIC on March 25, 2024, directing WSI and GMIC to cure WSI's breaches within forty-eight hours pursuant to Paragraph 14 of the James Run Countertop Subcontract and pursuant to the applicable Performance Bond.  A copy of the March 25, 2024 Declaration of Default/Breach and Direction to Cure is attached to this Complaint as Exhibit "B."

23.     Specifically, Harkins directed WSI and GMIC to provide (a) a written plan to cure WSI's breaches and a recovery plan to mitigate delays, (b) a full accounting of WSI's outstanding debts to suppliers, vendors, and subcontractors relating to the James Run Countertop Subcontract, (c) written consent of GMIC for all future payments to WSI, and (d) releases of liens from WSI's suppliers, vendors, and subcontractors.

24.     WSI and GMIC failed to comply with Harkins' written direction, constituting further breach by WSI of the James Run Countertop Subcontract and breach by GMIC of the applicable Performance Bond, and failed to cure WSI's breaches.

25.     Therefore, Harkins terminated the James Run Countertop Subcontract for default on April 10, 2024.  A copy of the April 10, 2024 termination letter is attached as Exhibit "C."

26.     Harkins simultaneously sent a copy of the April 10th termination letter to GMIC, which acknowledged receipt of same on April 12, 2024.

27.     In the April 10th termination letter, Harkins stated that pursuant to Paragraph 14(d) of the Subcontract and pursuant to the applicable Bond, Harkins would be exercising its right to takeover WSI's materials and supplies to complete WSI's work and holding both WSI and GMIC fully liable for all costs and expenses incurred as a result of WSI's breaches of the James Run Countertop Subcontract.

### 2.     *The James Run Cabinetry Subcontract.*

28.     On or about December 6, 2024, Harkins and WSI entered into a written agreement whereby WSI agreed to furnish and install cabinetry in all of the residential units at James Run in exchange for the original subcontract amount of $1,300,000.00 (the "James Run Cabinetry Subcontract"). A copy of the James Run Cabinetry Subcontract is attached to this Complaint as Exhibit "D."

29.     Like the James Run Countertop Subcontract, the James Run Cabinetry Subcontract stated that "time [was] of the essence" and that WSI was required to perform its work in strict accordance with the James Run Countertop Subcontract and in a "first-class manner in accordance with the Contractor's construction schedule for the Work, which may be modified from time to time by Contractor as reasonably necessary." Ex. D, James Run Cabinetry Subcontract § 5, at 2.

30.     WSI was also required to "supply a sufficient number of skilled workmen or quantity or type of materials or equipment of proper quality" and to "prosecute the Work of covered by [the] Subcontract with promptness and diligence." *Id.*

31.     However, WSI failed and/or refused to supply an adequate supply of manpower and a sufficient quantity of cabinetry materials to prosecute its work in accordance with the James Run schedule and WSI's agreed upon production rates.

5

32. WSI's failures included, but were by no means limited to, furnishing and installing cabinetry in just six- and one-half units per week, despite the agreed upon production rate of four units per day (or twenty units per week) required by the James Run Cabinetry Subcontract.

33. On February 1, 2024, Harkins sent WSI and GMIC a Notice of Breach and Direction to Cure due to WSI's untimely and deficient work. A copy of the February 1st Notice of Breach and Direction to Cure is attached to this Complaint as Exhibit "E."

34. WSI failed and/or refused to comply with Harkins' written direction and to cure its breaches as required by the February 1st Notice of Breach and Direction to Cure, thereby further breaching the James Run Cabinet Subcontract.

35. On February 27, 2024, Harkins sent WSI and GMIC a Declaration of Default/Breach and Direction to Cure within forty-eight hours pursuant to Paragraph 14 of the James Run Cabinetry Subcontract and pursuant to the applicable Bond. A copy of the February 27th Declaration of Default/Breach and Direction Cure is attached as Exhibit "F."

36. Harkins directed WSI and GMIC to (a) submit a written plan to cure WSI's breaches and a recovery plan to mitigate the impact of WSI's delays, (b) submit a full accounting of all outstanding payments owed by WSI to its suppliers, subcontractors and other vendors arising out of the James Run Cabinetry Subcontract, and (c) provide a financial plan demonstrating how either WSI and GMIC would satisfy their performance and payment obligations under the James Run Cabinetry Subcontract and the applicable Bond.

37. WSI and GMIC failed to comply with or adequately respond to Harkins' written direction, constituting further breach by WSI of the James Run Cabinetry Subcontract and breach by GMIC of the applicable Bond, and failed to cure WSI's breaches.

6

38.     Therefore, Harkins terminated the James Run Cabinetry Subcontract for default on April 10, 2024. A copy of the April 10th termination letter is attached to this Complaint as Exhibit "G."

39.     In the April 10th termination letter, Harkins stated that pursuant to Paragraph 14(d) of the Subcontract and pursuant to the applicable Bond, Harkins would be exercising its right to takeover WSI's materials and supplies to complete WSI's work and holding WSI and GMIC fully liable for all costs and expenses incurred as a result of WSI's breaches of the James Run Cabinetry Subcontract.

40.     GMIC contemporaneously received a copy of the April 10th letter from Harkins to WSI terminating the James Run Cabinetry Subcontract for default, which it acknowledged receiving on April 12, 2024.

**B.     The Rosewick Project.**

41.     On or about May 31, 2023, Harkins and WSI entered into a written subcontract agreement whereby WSI agreed to furnish and install all countertops and cabinets for the Rosewick Project in exchange for the base subcontract amount of $1,858,809.00 (the "Rosewick Subcontract").  A copy of the Rosewick Subcontract is attached as Exhibit "H."

42.     WSI repeatedly refused and/or failed to procure cabinetry and manpower necessary to complete its scope of work in strict accordance with the Rosewick Subcontract and in accordance with the Rosewick schedule and WSI's agreed upon production rate, which was five units per day (or twenty-five units per week).

43.     During a meeting between Harkins, WSI, and WSI's cabinetry supplier, Kitchen Cabinets Designs, LLC ("KCD") on or about January 30, 2024, which was scheduled specifically to discuss WSI's performance issues, WSI informed Harkins that its "best case scenario" was just six- and one-half units per week and that it was struggling to pay its suppliers.

44. Shortly after that meeting, KCD informed Harkins that it had not been paid by WSI and, as a result, the supply and delivery of cabinets at Rosewick was halted.

45. On February 1, 2024, Harkins sent WSI and GMIC a Notice of Breach and Direction to Cure due to WSI's untimely and deficient work. A copy of the February 1st Notice of Breach and Direction to Cure is attached to this Complaint as Exhibit "I."

46. WSI failed and/or refused to comply with Harkins written direction and to cure its breaches as required by the February 1st Notice of Breach and Direction to Cure, thereby further breaching the Rosewick Subcontract.

47. Additionally, during a February 27, 2024 meeting, WSI informed Harkins that it was unable to make payroll for its shop assembly employees and was at risk of losing them, which would further delay or halt production of cabinetry and countertops on both the James Run and Rosewick projects.

48. Following its February 27th meeting with WSI, Harkins sent WSI and GMIC a Declaration of Default/Breach and Direction to Cure within forty-eight hours pursuant to Paragraph 14 of the Rosewick Subcontract and pursuant to the applicable Bond. A copy of the February 27th Declaration of Default/Breach and Direction Cure is attached as Exhibit "J."

49. Harkins directed WSI and GMIC to (a) submit a written plan to cure WSI's breaches and a recovery plan to mitigate the impact of WSI's delays, (b) submit a full accounting of all outstanding payments owed by WSI to its suppliers, subcontractors and other vendors arising out of the Rosewick Subcontract, and (c) provide a financial plan demonstrating how either WSI and GMIC would satisfy their performance and payment obligations under the Rosewick Subcontract and the applicable Bond.

50. WSI and GMIC failed to comply with Harkins' written direction, constituting further breach by WSI of the Rosewick Subcontract and breach by GMIC of the applicable Bond, and failed to cure WSI's breaches.

51. Therefore, Harkins terminated the Rosewick Subcontract for default on April 10, 2024. A copy the April 10, 2024 termination letter is attached as Exhibit "K."

52. GMIC acknowledged receipt of the April 10th termination letter on April 12, 2024.

53. In the April 10th termination letter, Harkins stated that pursuant to Paragraph 14(d) of the Subcontract and pursuant to the applicable Bond, Harkins would be exercising its right to takeover WSI's materials and supplies to complete WSI's work and holding WSI and GMIC fully liable for all costs and expenses incurred as a result of WSI's breaches of the Rosewick Subcontract.

### C. The Bonds.

54. As noted above, GMIC issued a Bond for each of the WSI Subcontracts:

   a. Bond No. GM220245 for the James Run Countertop Subcontract.
   b. Bond No. GM229408 for the James Run Cabinetry Subcontract.
   c. Bond No. GM 220246 for the Rosewick Subcontract.

Copies of the Bonds are attached, together, as Exhibit "L."

55. Each of the Bonds expressly incorporated by reference all terms and conditions of the applicable WSI Subcontract. *See, e.g.*, Ex. L at 1 (stating "Subcontract is incorporated herein by reference and made a part hereof for all purposes").

56. Furthermore, GMIC issued the Bonds to guarantee complete, timely, and satisfactory performance of WSI's work under the WSI Subcontracts:

> [T]he condition of this obligation is such that if the Subcontractor shall faithfully perform, fulfill, and fully satisfy the Subcontract on its part and shall have fully defended, indemnified, and saved harmless the Contractor upon demand from and against all costs, damages, expenses, wages, interest, penalties, fines, attorney's fees, or any other cost or expenses imposed by contract, applicable law, or otherwise (collectively "Damages") which Contractor may suffer by reason of

9

> Subcontractor's failure to do so, including without limitation all such Damages that Contractor may incur in making good any Subcontractor . . . default or breach of the Subcontract, then this obligation shall be null and void; otherwise, it shall remain in full force and effect[.]

*Id.* at 1, 3, 5.

57. If, upon WSI's breach or default of the WSI Subcontracts, WSI failed to defend, indemnify, hold harmless and reimburse Harkins for any and all damages resulting from those breaches or defaults, GMIC was obligated to "upon notice from Contractor, take immediate action to fulfill its obligations under [the] Bond[s] and defend, indemnify, hold harmless, and reimburse Contractor for Damages as they are incurred." *Id.*

58. The Bonds further stipulated that Harkins was permitted to take any and all actions it deemed necessary to complete the work under the WSI Subcontracts and maintain the James Run and Rosewick schedules, whether before or after WSI's breaches and/or defaults occurred. *Id.* ("The surety recognizes that time is of the essence and agrees that Contractor is permitted to take actions before or after Subcontractor's breach and/or default which are necessary to maintain the Project schedule and complete the Work.").

59. In total, Harkins incurred $562,217.16 in out-of-pocket costs and expenses over and above the aggregate unpaid balance across the WSI Subcontracts.

60. As explained more fully below, these costs consisted of Harkins' direct payments to WSI's vendors and suppliers and the procurement of replacement subcontractors and suppliers to correct and/or complete all work required by the WSI Subcontracts at James Run and Rosewick.

61. Under Paragraph 14(d) of the WSI Subcontracts, which are explicitly incorporated into the Bonds by reference, Harkins had the right to terminate the WSI Subcontracts and take over the work if WSI and/or GMIC failed to cure WSI's contractual breaches and/or defaults within two days of written notice and opportunity to cure.

62. Furthermore, in the event Harkins exercised its rights under Paragraph 14(d), WSI and/or GMIC are liable for all costs and expenses incurred to complete the work:

> Subcontractor and its surety, if any, shall be fully liable for all costs and expenses as they are incurred or accrued arising out of or resulting from completion of the Work immediately upon written demand(s), including without limitation attorneys' and consultants' fees, interest, all other damages and expenses incurred by Contractor as a result of such breach and the termination and as otherwise may be allowable under any other provision of the Subcontract Documents, and Contractor's general overhead of the total thereof of 10%.

Exs. A, D, & H § 14, at 5.

63. On March 25, 2025, Harkins' made a written demand to GMIC for reimbursement of the costs and expenses it incurred to correct and/or complete WSI's work under the WSI Subcontracts, totaling $562,217.16.[1]  A copy of Harkins' demand is attached as Exhibit "M."

64. Notwithstanding GMIC's obligations under the Bonds, on April 14, 2025, GMIC rejected Harkins' written demand for reimbursement, refusing to pay any of the costs or expenses that Harkins is entitled to recover from GMIC under the Bonds and thereby breaching the Bonds. A copy of GMIC's April 14th Letter (without exhibits) is attached as Exhibit "N."

65. GMIC's April 14th response does not dispute that WSI breached the WSI Subcontracts, nor does GMIC dispute that Harkins incurred significant out-of-pocket expenses to correct and/complete WSI's work.

66. All conditions precedent to suit have been satisfied or waived.

## COUNT I – BREACH OF BOND NO. GM220245
**(the James Run Countertop Subcontract)**

67. Harkins incorporates each and every preceding Paragraph as if fully set forth herein at length.

---

[1] This number does not include ongoing interest, attorneys' fees or consultant fees, which Harkins is entitled to under the terms of the WSI Subcontracts and the Bonds.

68. The James Run Countertop Subcontract was a valid and enforceable written contract between Harkins and WSI.

69. WSI breached the James Run Countertop Subcontract by, among other things:

    a. Failing to supply adequate manpower to comply with Harkins' schedule;
    b. Failing to procure the materials necessary to complete its scope of work;
    c. Failing to timely pay its subcontractors and/or suppliers; and
    d. Failing to comply with the production rates set forth in the James Run Countertop Subcontract.

70. WSI and GMIC failed to comply with Harkins' written notices and direction to cure, resulting in Harkins' termination of the James Run Countertop Subcontract for default on April 10, 2024.

71. As a result of WSI's breaches of the James Run Countertop Subcontract, Harkins has incurred out-of-pocket costs and expenses totaling $229,371.65, exclusive of ongoing interest, attorneys' fees, and consultant fees.

72. GMIC is obligated by the express terms of Bond No. GM220245 to reimburse Harkins for these costs.

73. By refusing and/or failing to reimburse Harkins in the amount of $229,371.65, GMIC has breached the terms of Bond. No. GM220245.

WHEREFORE, Harkins respectfully requests that this Honorable Court enter judgment in Harkins' favor and against GMIC in an amount not less than $229,371.65 under Count I of Harkins' Complaint, along with interest, attorneys' fees, consultant fees, and any such other, further, and different relief that this Court deems just and proper.

### COUNT II – BREACH OF BOND NO. GM229408
**(the James Run Cabinetry Subcontract)**

74. Harkins incorporates each and every preceding Paragraph as if fully set forth herein at length.

75. The James Run Cabinetry Subcontract is a valid and enforceable written contract between Harkins and WSI.

76. WSI breached the James Run Cabinetry Subcontract by, among other things:

    a. Failing to supply adequate manpower to comply with Harkins' schedule;
    b. Failing to procure the materials necessary to complete its scope of work;
    c. Failing to timely pay its subcontractors and/or suppliers; and
    d. Failing to comply with the production rates set forth in the James Run Cabinetry Subcontract.

77. WSI and GMIC failed to comply with Harkins' written notices and direction to cure, resulting in Harkins' termination of the James Run Cabinetry Subcontract for default on April 10, 2024.

78. As a result of WSI's breach of the James Run Cabinetry Subcontract, Harkins has incurred out-of-pocket costs and expenses totaling $266,814.36, exclusive of ongoing interest, attorneys' fees, and consultant fees.

79. GMIC is obligated by the express terms of Bond No. GM229408 to reimburse Harkins for these costs.

80. By refusing and/or failing to reimburse Harkins in the amount of $266,814.36 GMIC has breached the terms of Bond. No. GM229408.

WHEREFORE, Harkins respectfully requests that this Honorable Court enter judgment in Harkins' favor and against GMIC in an amount not less than $266,814.36 under Count II of Harkins' Complaint, along with interest, attorneys' fees, consultant fees, any such other, further, and different relief that this Court deems just and proper.

### COUNT III – BREACH OF BOND NO. GM220246
**(the Rosewick Subcontract)**

81. Harkins incorporates each and every preceding Paragraph as if fully set forth herein at length.

82. The Rosewick Subcontract is a valid and enforceable written contract between Harkins and WSI.

83. WSI breached the Rosewick Subcontract by, among other things:

    a. Failing to supply adequate manpower to comply with Harkins' schedule;
    b. Failing to procure the materials necessary to complete its scope of work;
    c. Failing to timely pay its subcontractors and/or suppliers; and
    d. Failing to comply with the production rates set forth in the Rosewick Subcontract.

84. WSI and GMIC failed to comply with Harkins' written notices and direction to cure, resulting in Harkins' termination of the Rosewick Subcontract default on April 10, 2024.

85. As a result of WSI's breaches of the Rosewick Subcontract, Harkins has incurred out-of-pocket costs and expenses totaling $66,031.15, exclusive of ongoing interest, attorneys' fees, and consultant fees.

86. GMIC is obligated by the express terms of Bond No. GM220246 to reimburse Harkins for these costs.

87. By refusing and/or failing to reimburse Harkins in the amount of $66,031.15, GMIC has breached the terms of Bond. No. GM220246.

WHEREFORE, Harkins respectfully requests that this Honorable Court enter judgment in Harkins' favor and against GMIC in an amount not less than $66,031.15 under Count III of Harkins' Complaint, along with interest, attorneys' fees, and consultant fees, and any such other, further, and different relief that this Court deems just and proper.

Date: May 5, 2025

                                          Respectfully submitted,

                                          **HARKINS BUILDERS, INC.**

                                          /s/ James C. Thompson, Jr.

James C. Thompson, Jr., Esq.
Bar No. 09317
Harkins Builders, Inc.
10490 Little Patuxent Parkway, #400
Columbia, MD 21044
(t): 410-750-2600
(e): jthompson@harkinsbuilders.com

*Counsel for Plaintiff,*
*Harkins Builders, Inc.*